**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>  )<br>v.   )<br>  )   Criminal Action No. 2021-0001<br>JAHSEEN SIMMONDS,   )<br>  )<br>Defendant.   )<br>_____ ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
  *For the United States*

**Lisa L. Brown Williams, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Jahseen Simmonds' ("Defendant") "Motion to Suppress Physical Evidence and Statements" ("Motion to Suppress") (Dkt. No. 19), the Government's Opposition thereto, and the evidence and arguments presented at the subsequent suppression hearing. For the following reasons, the Court will deny Defendant's Motion to Suppress.

### I. BACKGROUND

On January 26, 2021, Defendant was charged with the following counts in an Information: (1) Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) Possession of a Firearm in a School Zone, in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B); and (3) Possession of Marijuana with Intent to Distribute Near a School, in violation of 21 U.S.C. §§ 841(a), (b)(1)(D), and 860(a). (Dkt. No. 1).

On February 22, 2021, Defendant filed a motion seeking to suppress "[a]ll physical evidence that was obtained as a result of the illegal search and seizure in violation of [Defendant's] constitutional rights." (Dkt. No. 19 at 1). During the subsequent suppression hearing, the Government presented the testimony of two witnesses: Officers Darryl Walcott ("Officer Walcott") and Moses President ("Officer President") of the Virgin Islands Police Department ("VIPD"). The following evidence emerged from the testimony of the two witnesses.[1]

On September 3, 2020, at approximately 7:22 p.m., Officers Walcott and President were on patrol as part of the Rapid Intervention Team ("RIT") in the vicinity of Building 29 of the John F. Kennedy Housing Community ("JFK"), which is in a high crime area in St. Croix, Virgin Islands. Officer Walcott was in a marked police vehicle with his partner, while other members of the RIT—including Officer President—were on foot. There were a total of approximately 7-8 officers in the JFK area.

Officer President approached Building 29 of JFK with other officers, where they could see a group of five individuals sitting under an archway. Upon seeing Officer President and the other officers, three of the individuals took off running, and the other two remained under the archway. Officer President observed one of the individuals—a male wearing a white t-shirt and jeans and carrying a black backpack—run up the adjacent stairs. Meanwhile, Officer Walcott exited his vehicle and was promptly advised of the same. The individual who ran up the stairs was later identified as Defendant.

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Officers Walcott and President pursued Defendant and chased him up the stairs of Building 29. On the way up the stairs, they discovered a black backpack. Officer Walcott opened the backpack and found $28 in U.S. currency, a scale, a box of plastic wrap, a mason jar containing three small bags of marijuana, one Ziploc bag containing 31 phials of marijuana, a large baggie containing brown dried marijuana, and a half-filled Ziploc bag containing marijuana. The officers then continued on and reached the second floor which had two apartments, one of which was Apartment 181. The officers knocked on the doors of the apartments, and Officer Walcott shouted that they were the police, and whoever went into the apartment needed to come out or they would kick down the doors. While they were knocking on the doors, one of the officers located in the parking lot called up to Officer President and notified him that there was someone in the window of Apartment 181 trying to get the officers' attention.

Eventually, Defendant answered the door of Apartment 181. Officer Walcott testified that he immediately recognized Defendant as someone with whom he had several previous encounters involving firearms. Officer Walcott asked Defendant whether he lived in the apartment, to which Defendant answered "no." Defendant then informed the officers that the black backpack belonged to him. Officers President and Walcott left Defendant with another officer and entered Apartment 181, where they made contact with the owner—who did not want to identify herself—and an individual named "Calvin" who informed them that Defendant had come into the apartment. The owner of the apartment told the officers that she knew Defendant from being in the area, but that she did not give him permission to enter her home. She then gave the officers permission to search her apartment.

The officers were advised that Defendant eventually made his way to the apartment's balcony, so they quickly searched the living room and kitchen before going to the balcony. There,

the officers found a black gun and an extended magazine resting on a pile of clothes. The occupants told the officers that the gun was not theirs and was not on the balcony when they were there doing laundry before Defendant arrived. The gun had one live 9mm round in the chamber, 15 live 9mm rounds in the magazine, and 31 live 9mm rounds in the extended magazine.

The officers exited the apartment and Officer President asked Defendant why he ran into the apartment and whether he was licensed to possess a firearm and ammunition. In response, Defendant stated: "I have nothing to say." Officer President then contacted the Firearms Bureau and learned that Defendant did not have a license to possess a firearm or ammunition in the U.S. Virgin Islands. The officers arrested Defendant, handcuffed him, and transported him to the Wilbur H. Francis Command Center in Frederiksted. There, Defendant was advised of his *Miranda* rights, booked, and processed. Defendant signed his advice of rights form, declined to sign the waiver form, and did not make a statement. Approximately 25 minutes passed between the time when Defendant ran into Apartment 181 and when he was arrested.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   *Miranda* Custodial Interrogation and *Terry* Stops

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). Because the defendant must be both taken into custody and subject to an interrogation to trigger *Miranda* warnings, "in the absence of one

or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. App. Div. 1997). The issue of custody turns on whether the defendant's freedom of movement was restrained to the "degree associated with a formal arrest" and whether the environment he was in simulated the "same inherently coercive pressures" that exist in a station house. *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999); *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980)).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established the principle that the "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). The Supreme Court has found that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010); *see also United States v. Lewis*, Criminal No. 2008-21, 2008 WL 2625634, at *6 (D.V.I. July 2, 2008) (finding that since the defendants were "initially detained pursuant to a lawful *Terry* stop . . . '[s]uch *Terry*-stops do not render a person in custody for purposes of *Miranda*.'" (quoting *United States v. Galberth*, 846 F.2d 983, 994 (5th Cir. 1988)) (citations omitted)); *United States v. Denson*, Criminal No. 06-75, 2006 WL 3144857, at *3 (W.D. Pa. Oct. 31, 2006) ("*Miranda* warnings are not required . . . during a valid *Terry* stop." (citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 184 (2004))). Thus, in the context of a *Terry* stop, the fact that the

officers "failed to give antecedent *Miranda* warnings would not render their subsequent questions impermissible." *United States v. Bennett*, No. CRIM. A. 00-409, 2000 WL 1358480, at *8 (E.D. Pa. Sept. 20, 2000).[2]

In determining the legality of an alleged *Terry* stop, courts determine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. *Terry*, 392 U.S. at 20. It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). "[B]ecause probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d

---

[2] "There is no question that a Terry stop constitutes a seizure," *United States v. Ford*, Crim. No. 10-cr-13, 2010 WL 2305868, at *3 n.2 (D.V.I. June 4, 2010) (citing *United States v. Edwards*, 53 F.3d 616, 620 (3d Cir. 1995) ("Clearly, a *Terry* stop is a seizure . . . and one seized is by definition not free to leave.")). However, it is deemed a legally permissible warrantless seizure as long as "the intrusiveness of the stop [does not] exceed[] the level of suspicion supporting the stop." *Ford*, 2010 WL 2305868 at *3 n.2 (citing *Edwards*, 53 F.3d at 619 ("Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." (internal citation and quotation marks omitted))).

239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) ("An officer cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." (internal citation omitted)). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. at 500. Thus, a *Terry* stop initially justified by reasonable suspicion may turn into a de facto arrest requiring probable cause "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)).

During a *Terry* stop, a "'person may be briefly detained against his will while pertinent questions are directed to him.'" *Kolender v. Lawson*, 461 U.S. 352, 365 (1983) (Brennan, J., concurring) (quoting *Terry*, 392 at 34 (White, J., concurring)). Officers "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). These questions may be asked in a manner that is "calculated to obtain an answer . . . [b]ut they may not *compel* an answer." *Kolender*, 461 U.S. at 366 (Brennan, J., concurring) (emphasis in original). The subject of a *Terry* stop does not need to "answer any question put to him; indeed, he may

decline to listen to the questions at all." *Royer*, 460 U.S. at 498. "Where an individual has been detained . . . and officers' questioning stays within the bounds of questioning permitted during a *Terry* stop," *Miranda* warnings are not required. *United States v. Davis*, 530 F.3d 1069, 1081 (9th Cir. 2008).

### B. Voluntariness of Statements

To determine the voluntariness of a statement, a court "must consider the effect that the totality of the circumstances had upon the will of the defendant." *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). "[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz,* 162 Fed. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (internal quotation marks omitted). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the [statement.]" *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (internal citation omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id*.

### C. Search

The Fourth Amendment protects individuals from unreasonable searches. U.S. Const. amend. IV. "The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). However, a warrantless search of property is permissible under the Fourth Amendment where the owner has abandoned his reasonable expectation of privacy in that property. *United States v. Fulani,* 368 F.3d 351, 354 (3d Cir. 2004) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). This determination must be made from an objective viewpoint, and proof of intent to abandon must be established by clear

and unequivocal evidence. *Id*. Courts must look at the totality of the facts and circumstances in determining whether an individual did, in fact, abandon his reasonable expectation of privacy in the property at issue. *Id.*; *see also McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011). "In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012) (citing *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999)).[3]

### III. DISCUSSION

#### A. *Terry* Stop

Defendant argues that he was in custody and interrogated prior to being given his *Miranda* warnings. (Dkt. No. 19 at 5-6). He maintains that he was in custody for *Miranda* purposes because he "was not free to simply walk away from the officers who approached him on September 3, 2020." *Id*. at 6. The Government counters that Defendant was neither taken into custody nor interrogated for purposes of *Miranda*. (Dkt. No. 25 at 3-7). Instead, it is the Government's position that the Defendant was subject to a *Terry* stop, rather than a custodial interrogation. *Id*. at 6-7.

Based on the totality of the circumstances, the Court concludes that Defendant was subject to a *Terry* stop, and therefore *Miranda* was not triggered.

#### 1. The Detention of Defendant

The Court finds that Defendant's detention constituted a legitimate *Terry* investigatory stop because the officers had at least reasonable suspicion—based on their own observations of Defendant—that Defendant was engaged in criminal activity. Specifically, the various

---

[3] "[A]bandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *Fulani*, 368 F.3d at 354 (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)); *see also United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005).

observations that Officers Walcott and President made allowed them to have a "particularized and objective basis" for suspecting Defendant of criminal activity. *Brown*, 448 F.3d at 246.[4]

Defendant can be deemed to have been seized for purposes of the *Terry* stop as of the time that he opened the door of Apartment 181 in response to Officer Walcott's directive. Indeed, an individual is "seized" for purposes of a *Terry* stop when that individual has submitted to an officer's show of authority. *United States v. Lowe*, 791 F.3d 424, 430-31 (3d Cir. 2015). By this time, there was more than ample evidence to support a finding of reasonable suspicion.

First, Defendant was in a high crime area and, when he saw law enforcement, he took off running. The fact that the stop occurred in a "high crime area" is a relevant contextual consideration in a *Terry* analysis. *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Another factor that reflects suspicious behavior is Defendant's "unprovoked flight upon noticing the police." *United States v. Scott*, 816 F. App'x 732, 737 (3d Cir. 2020) (internal quotation marks and citation omitted). Further, before entering Apartment 181, the officers encountered a backpack on the steps where Defendant had passed. The backpack resembled the one that Defendant had been carrying and contraband was discovered inside. The officers were also alerted that someone in the window of Apartment 181 was trying to get their attention. In addition, once Officer Walcott saw Defendant, he recognized

---

[4] The Court also notes that although many *Terry* stops occur on the street or in a vehicle, they may take place at or near a residence. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[T]he [Fourth Amendment] exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* . . . ."); *see also United States v. Crapser*, 472 F.3d 1141, 1148-49 (9th Cir. 2007) (finding that a *Terry* stop can occur at a person's own residence, as long as seizure occurs outside the home and not inside the residence); *Denson*, 2006 WL 3144857, at *2-5 (finding valid a *Terry* stop of a defendant which occurred in another individual's residence who allowed officers inside).

him as someone he had interacted with previously with regard to firearms-related incidents. *See United States v. McIntosh*, 289 F. Supp. 2d 672, 678 (D.V.I. App. Div. 2003) (concluding that an officer had a reasonable, articulable suspicion that a defendant illegally possessed a firearm on his person in part because the officer recognized the defendant from other incidents involving firearms). The Court finds that these facts, taken together, support the conclusion that law enforcement had at least the requisite reasonable suspicion to "stop," i.e., seize, Defendant for investigatory purposes. *See Wardlow*, 528 U.S. at 124-25 (concluding that an officer was justified in suspecting that a defendant was involved in criminal activity due to the defendant's presence in an area of heavy narcotics trafficking together with his unprovoked flight); *Valentine*, 232 F.3d at 357 ("[W]e conclude that the officers had reasonable suspicion [to stop the defendant] after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw [the defendant] and his two companions walk away as soon as they noticed the police car."); *see also United States v. Gonsalves*, Criminal Action No. 19-cr-0011, 2020 WL 1170217, at *5 (D.V.I. Mar. 10, 2020); *United States v. Abdallah*, Criminal Action No. 2014-010, 2015 WL 327388, at *4 (D.V.I. Jan. 26, 2015); *United States v. Clark*, Criminal Action No. 2018-0009, 2019 WL 3456813, at *10 (D.V.I. July 30, 2019).

Additionally, the officers did not employ investigative methods that were overly intrusive or that required unnecessary force. *Royer*, 460 U.S. at 499-500. Indeed, the Court finds that the officers' conduct during the *Terry* stop was "justified by the information known to the officer[s] at the initiation of the stop and . . . limited in scope by the circumstances that justified the interference in the first place." *United States v. Nichols*, Criminal Action Nos. 15-85-01, 15-85-02, 2015 WL 13344676, at *4 (E.D. Pa. Oct. 8, 2015) (citing *Royer*, 460 U.S. at 500). As discussed above, the officers observed Defendant fleeing from them in a high crime area; discovered an

abandoned backpack on the path traversed by Defendant, which resembled the one that Defendant had been carrying and contained contraband; were alerted that someone in Apartment 181 was trying to get their attention; and recognized Defendant as someone who had previously been encountered in connection with firearm-related incidents. As the investigation continued, the officers learned that Defendant likely left a gun in an apartment into which he had fled uninvited.[5] Thus, chasing Defendant after his unprovoked flight, searching the abandoned backpack, and searching Apartment 181 after getting permission to do so were reasonable actions taken within the scope of the *Terry* stop.[6] Indeed, the officers' conduct was necessary to confirm or dispel whether Defendant was involved in criminal activity. In addition, there is no basis for concluding that the investigative detention—which was only approximately 25 minutes—was longer than necessary to "effectuate the purpose of the stop." *Royer*, 460 U.S. at 500.

---

[5] After entering the balcony of Apartment 181, the officers located a gun with ammunition, which the apartment occupants represented was not theirs, and was not on the balcony before Defendant's uninvited entrance into the apartment.

[6] At the suppression hearing, Defendant argued that he was subjected to an arrest—rather than a *Terry* stop—in part because when the officers were knocking on the door of Apartment 181, Officer Walcott directed the occupants to open the door or he would kick it down. Defendant cited no authority to support this proposition. Indeed, even assuming that Defendant opened the door of Apartment 181—in which he was an uninvited intruder—in response to Officer Walcott's directive, it is unclear how this scenario would constitute an arrest. *Lowe*, 791 F.3d at 430-31 (explaining that an individual can be seized for purposes of *Terry* when he submits to an officer's show of authority, and that "[w]hen a suspect flees after a show of authority, the moment of submission is often quite clear: It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force."); *see also United States v. Davis*, No. CR 2017-0038-01, 2020 WL 3800534, at *10 (D.V.I. July 6, 2020) (finding that a *Terry* stop was valid where an officer, *inter alia*, knocked on the door of a restroom where the defendant was and directed him to step outside). To the contrary, a *Terry* stop is a seizure in which officers may use reasonable means to effectuate. *See Edwards*, 53 F.3d at 619. The Court concludes that Officer Walcott's action here in directing that the door of Apartment 181 be opened or he would kick it down was reasonable under the circumstances because it did not exceed the level of suspicion supporting the *Terry* stop. This is especially so given that Defendant had fled from the officers to the area of Apartment 181, and Officer President learned that someone in Apartment 181 was attempting to get the officers' attention. *See Ford*, 2010 WL 2305868 at *3 n.2.

12

In view of the foregoing, the Court finds that Defendant's detention constituted a valid *Terry* stop, and that *Miranda* was not implicated.

### 2. The Questioning of Defendant

In his Motion to Suppress, Defendant also argues that he was interrogated in violation of *Miranda*. (Dkt. No. 19 at 5-6). The Government responds that because this was a *Terry* stop rather than an arrest, there was no custodial interrogation. (Dkt. No. 25 at 5-7). Because the Court has concluded that Defendant was subject to a *Terry* stop, rather than *Miranda* custody, this issue turns on whether the questioning of Defendant was appropriate under a *Terry* stop. The Court finds in the affirmative.

When Defendant opened the door of Apartment 181, Officer Walcott asked Defendant whether he lived in the apartment. Defendant answered "no." As discussed above, by this time, the officers already had knowledge of facts giving rise to a reasonable suspicion of criminal activity. This benign question, directed to the person who opened the door of the apartment from which someone was trying to get the officer's attention, was clearly appropriate as a precursor to any further investigation. Defendant was neither in custody nor interrogated for purposes of *Miranda*. Such questioning is clearly appropriate as part of a *Terry* stop. *See United States v. Briggs*, 382 F. App'x 138, 139 (3d Cir. 2010) (concluding that a *Terry* stop was proper in a situation which included the officers asking the defendant who he was visiting at an apartment building).

Defendant then informed the officers that the backpack on the staircase was his. At the evidentiary hearing, Officer Walcott testified that Defendant voluntarily stated that the backpack on the stairs belonged to him, and that none of the officers had asked him any questions about the backpack. "Spontaneous statements made [by a suspect] 'without prompting'" do not implicate

*Miranda* because they are not a product of interrogation. *United States v. St. Rose*, 189 F. Supp. 3d 528, 547 (D.V.I. 2016); *see also United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007); *Bonner*, 469 F. App'x at 126 (finding that the defendant was not subject to interrogation in part because the defendant "volunteered incriminating information without any direct questioning."). Thus, *Miranda* was not implicated when Defendant spontaneously told the officers that the backpack belonged to him.

After the officers searched Apartment 181, Officer President asked Defendant why he ran into the apartment and whether he had a license to possess a firearm and ammunition. Defendant stated: "I have nothing to say." These questions were proper under *Terry* because Defendant was not in custody and the questions were related to the officers' suspicion that Defendant was engaged in criminal activity. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) (finding that the officers did not exceed the scope of a valid *Terry* stop when they asked a suspect what was going on); *United States v. Denson*, Criminal No. 06-75, 2006 WL 3144857, at *5 (W.D. Pa. Oct. 31, 2006) (finding that it is appropriate to ask a defendant whether he had a license to carry a gun during the course of a *Terry* stop after officers witnessed the defendant with a gun in his possession) (citing *United States v. Thomas*, 142 Fed. App'x 896 (6th Cir. 2005). Moreover, the subject of a *Terry* stop does not need to "answer any question put to him; indeed, he may decline to listen to the questions at all." *Royer*, 460 U.S. at 498. Here, Defendant did not answer the questions and the officers respected Defendant's right not to answer. Thus, the Court finds that under the circumstances here where there was no custodial interrogation, the questions were not improper under *Terry*.

Based on the foregoing, the Court concludes that the questioning of Defendant did not implicate *Miranda*.

**B.      Voluntariness of Statements**

Defendant alleges that his statements were involuntary and must be suppressed because he was approached by at least two armed officers and interrogated. (Dkt. No. 19 at 7). The Government argues that any statement that Defendant made was freely given without any compelling influence. (Dkt. No. 25 at 6).

The totality of the circumstances here show that Defendant's statements were voluntary. *Fenton*, 796 F.2d at 604. Throughout Defendant's encounter with law enforcement there were three officers present—with 7 to 8 officers at JFK altogether. There is no showing on the record that the officers' presence created the kind of coercive environment that would render Defendant's statements involuntary. *See United States v. Kofsky*, Criminal Action No. 06-392, 2007 WL 2480971, at *27 (E.D. Pa. Aug. 28, 2007) (finding that while the presence of 23 armed federal agents may function as one indicia of coercion, it "did not convert the interview of [the defendant] into a custodial interrogation."); *see also Gonsalves*, 2020 WL 1170217, at *9 (finding that the defendant's statements were voluntary in a situation where 5-6 officers were present and the defendant was handcuffed when he was asked questions).

Further, the setting where the interaction took place was at an apartment building, which does not suggest that Defendant was in a coercive environment. *Gonsalves*, 2020 WL 1170217, at *9; *United States v. Henry*, Criminal Action No. 2017-0001, 2018 WL 6840149, at *6 (D.V.I. Dec. 31, 2018). There is also nothing on the record to suggest that Defendant's age, education, and intelligence would have impacted the voluntariness of Defendant's statements. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009).

In addition, there is no evidence of any police coercion, let alone police coercion that would have overborne Defendant's will so as to render his statements involuntary. *United States v.*

15

*Lenegan*, Criminal Action No. 07-CR-689-04, 2008 WL 4058715, at *6 (E.D. Pa. Aug. 22, 2008), *aff'd*, 425 F. App'x 151 (3d Cir. 2011) (finding that the defendant's statements were made voluntarily where there was nothing in the record to indicate police coercion). Nor is there any suggestion that Defendant's spontaneous statement regarding ownership of the backpack was made with any compelling influence. *United States v. Nelson*, 483 Fed. App'x 677, 683 (3d Cir. 2012) ("Any statement given freely and voluntarily without any compelling influence, is of course, admissible in evidence." (quoting *Innis*, 446 U.S. at 299-30) (internal quotation marks omitted)).

In view of the foregoing, the Court finds that Defendant's statements were the product of "essentially free and unconstrained choice." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotation and citation omitted). Accordingly, Defendant's argument that his statements were involuntary will be rejected.

### C. Search

Defendant argues that he was illegally "searched," and that the evidence that was discovered as a result of this interaction was the product of an illegal search and seizure. (Dkt. No. 19 at 1, 4, 8). In response, the Government asserts that Defendant in fact abandoned this property—specifically, his backpack and firearm—and thus had no reasonable expectation of privacy in the physical evidence. (Dkt. No. 25 at 7-8).

Abandonment depends largely on the possessor's intent, *United States v. Minker*, 312 F.2d 632, 634 (3d Cir. 1962), "and the party relying on it must establish the necessary state of mind by clear and unequivocal evidence." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973) (citing *Friedman v. United States*, 347 F.2d 697, 704 (8th Cir. 1965) and *United States v. Robinson*, 430 F.2d 1141, 1143 (6th Cir. 1970)).

The totality of the facts and circumstances show that Defendant clearly and unequivocally abandoned both the backpack and the firearm for Fourth Amendment purposes. *Abel*, 362 U.S. at 241 (explaining that an individual has no reasonable expectation of privacy in abandoned property); *Fulani*, 368 F.3d at 354. Here, Defendant discarded his backpack on a staircase after fleeing from law enforcement officers,[7] and then discarded the firearm in an apartment where he did not live as the officers continued to pursue him. It is well established that property is abandoned when a defendant discards it while fleeing from police. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 629 (1991); *United States v. Acosta*, 751 F. App'x 201, 202-03 (3d Cir. 2018); *United States v. Richardson*, 504 F. App'x 176, 182 (3d Cir. 2012); *United States v. Rivera*, 441 F. App'x 87, 90 (3d Cir. 2011); *United States v. Davis*, 328 F. App'x 138, 142 (3d Cir. 2009); *Gov't of Virgin Islands v. Olinsky*, 119 F. App'x 405, 407 (3d Cir. 2005). Defendant abandoned both the backpack and the firearm during his flight from the officers and he therefore lacks Fourth Amendment standing to challenge the search and seizure thereof.

### D.     Fruit of the Poisonous Tree

Defendant argues that the evidence seized in this matter should be suppressed as "fruit of the poisonous tree"—as a result of both an illegal seizure and illegal search. (Dkt. No. 19 at 8). Evidence obtained as a result of an unreasonable search and seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). However, because the Court has found that no illegal search or seizure occurred under the circumstances presented here, no evidence is subject to suppression as "fruit of the

---

[7] At the suppression hearing, Defendant argued that he did not abandon his backpack because he eventually informed law enforcement that the backpack belonged to him. The Court rejects this argument because the officers searched the backpack when they found it abandoned on the staircase—before Defendant announced any ownership of it.

poisonous tree." *Cf. United States v. Mosley*, 454 F. 3d 249, 269 (3d Cir. 2006) (finding that because defendant was illegally seized, the guns found which directly resulted from his seizure were fruit of the poisonous tree and must be suppressed).

## IV.   CONCLUSION

In view of the foregoing, the Court finds that: (1) Defendant was subject to a valid *Terry* stop; (2) Defendant's statements were not subject to *Miranda* and were voluntary; (3) the officers acted lawfully in seizing and searching property that Defendant had abandoned; and (4) no statements or evidence should be suppressed as fruit of the poisonous tree. Accordingly, the Court will deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: September 17, 2021                  _____/s/_____
                                                                            WILMA A. LEWIS
                                                                            District Judge